**********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gillen and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence and having reviewed the competent evidence of record, the Full Commission reverses the Opinion and Award of Deputy Commissioner Gillen.
 **********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On December 5,2003, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act. *Page 2 
2. On that date, an employment relationship existed between plaintiff and defendant. Defendant was self-insured for workers' compensation.
3. Plaintiff's average weekly wage is $649.75, which yields a compensation rate of $433.19.
4. Plaintiff last worked for defendant on November 30, 2004.
5. Defendant has paid plaintiff no disability or medical compensation under the North Carolina Workers' Compensation Act as a result of the December 5, 2003 incident.
6. The following documentary exhibits, collectively paginated 1-197 and marked as stipulated exhibit 2, were stipulated into evidence by the parties:
 a. Industrial Commission Forms 18, 19, 61, 33 and 33R, including attachment to the Form 18.
 b. Plaintiff's medical records from James A. Smith, III, M.D., Knightdale Primary Care and Optum/Scottie Hogg.
 c. A transcript of plaintiff's recorded statement.
 d. Plaintiff's Answers to Defendant's First Set of Interrogatories and Requests for Production of Documents.
 e. Defendant's Responses to Plaintiff's First Set of Interrogatories and Request for Production of Documents.
 f. Plaintiff's employment records.
 g. The medical records of Dr. James Smith.
 h. The medical records of Dr. Jerry Noble.
The evidentiary record was supplemented by the admission of plaintiff's exhibits 1-4, submitted March 13, 2006. *Page 3 
 **********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 37 years old. She graduated from East Wake High School. While attending high school, plaintiff worked part-time for the Wake County Animal Shelter. After graduating from high school, she continued to work for the animal shelter on a part-time basis, and, in 1986, was promoted to the position of animal shelter manager and began working for defendant on a full-time basis.
2. During her employment as the shelter manager, plaintiff was bitten by two dogs. Plaintiff continued working as the shelter manager until June 1999 when she became a Wake County Animal Control Officer. Plaintiff worked from 8:30 a.m. to 5:15 p.m., five days per week. Plaintiff worked alone, but could call for assistance.
3. Plaintiff's duties as an Animal Control Officer included responding to calls involving nuisance animals, stray animals, animals whose owners could no longer care for them, and animal bites. Approximately fifty percent of the calls involved cats and fifty percent involved dogs.
4. During her tenure as an Animal Control Officer, plaintiff had to mace dogs about once a month and had to use a tranquilizer gun on dogs about once a month. Several times a year, dogs would actually run at plaintiff and be aggressive. Plaintiff always approached a dog with her mace ready. Plaintiff testified that dealing with aggressive dogs was part of the job and that she had attended various educational courses on using defensive devices and learning how to react when an animal attempted to attack her. Plaintiff anticipated and prepared for any dog that *Page 4 
she approached to become aggressive and attack her. As such, being confronted with an aggressive dog was not an unlooked for or untoward event unexpected by plaintiff.
5. On December 5, 2003, plaintiff received a call about a loose pit bull. Plaintiff arrived at the location and located the animal sitting on a porch. Plaintiff exited her vehicle and offered a treat to the dog, which it took and then immediately returned to the porch. Noting a fenced area, plaintiff decided to try and get the dog into the area. As she approached the fence, the dog ran out towards her wagging its tail and jumping around but then quickly returned to the porch. Plaintiff then reached to open the fence's gate. As she did so, the pit bull ran from the porch and began jumping around plaintiff with its mouth open. Plaintiff used mace on the dog and began walking back towards her vehicle. Once she made it to her vehicle, plaintiff called for assistance and tranquilized the dog with her tranquilizer gun. The entire incident lasted approximately 30 seconds.
6. Plaintiff testified that the dog did not bite her. When asked at the hearing before the deputy commissioner if there was any physical contact between her and the dog, plaintiff responded equivocally "[w]ell, I mean I think he did. I mean, as far as, like — I'm sure he probably bumped me some, you know, like with his legs and things like that, you know. But I mean, I don't know." Plaintiff further testified that the dog may have growled at her but did not bark at her.
7. Plaintiff testified that the dog attempted to come under the door and through the window. However, her description is not consistent with the initial report that plaintiff completed three days after the incident in which plaintiff did not describe the dog as trying to attack her under the door or through the window of her vehicle. Greater weight is given to the *Page 5 
report plaintiff completed three days after the incident rather than the testimony she gave at the hearing that took place one and a half years after the incident.
8. After plaintiff tranquilized the dog, she got out of her vehicle and investigated the dog's ownership with people in the neighborhood. She also interviewed the father of the dog's owner and a young girl who lived across the street. Plaintiff remained at the scene of the incident for some time and even called the sheriff's office to help interview the father as he was trying to hamper plaintiff's attempts to determine who owned the dog.
9. Plaintiff has not shown by the greater weight of the evidence that she suffered an accident on December 5, 2003 when she used her mace and tranquilizer gun to subdue an aggressive dog, a task that was a normal part of her work routine.
10. Thereafter, she continued to work as an Animal Control Officer but refused to handle any calls that involved pit bulls or other aggressive dogs. Plaintiff often received assistance on these calls from Mr. Allen, shelter workers, or from co-worker Donnie Barham. Mr. Barham testified that it was routine for him to ride with and assist other officers in dealing with aggressive dogs and that he has assisted every other officer with aggressive dogs.
11. Following the incident on December 5, 2003, plaintiff and Mr. Allen had several conversations about her inability to work with large or aggressive animals. Prior to the December 5, 2003 incident, plaintiff had been an excellent employee and had never feared or exhibited fear of any animals. After the incident, plaintiff's demeanor and personality changed. She became scared of vicious or big dogs. Mr. Allen suggested plaintiff seek some other employment. Plaintiff applied for seven positions with defendant between February and November 2004. Of these applications, however, only three were forwarded to the hiring *Page 6 
department for consideration because plaintiff had failed to properly complete the applications or did not meet the minimum qualifications for the positions.
12. Plaintiff sought treatment from Knightdale Primary Care and Dr. Lyle Parker on August 23, 2004, eight months after the incident. Upon presentation, plaintiff complained of stress and anxiety associated with being a single mother of an infant. Plaintiff complained of experiencing agitation, nervousness, poor sleep quality, and sadness. Plaintiff did not indicate that her symptoms were in any way related to the incident that occurred on December 5, 2003. She was diagnosed as having depression.
13. Nine months after the incident, plaintiff began counseling through her Employee Assistance Program. On September 14, 2004, plaintiff told her counselor, Ms. Scottie Hogg, about the pit bull attack that occurred in December 2003. She reported instances of panic attacks and shortness of breath and feeling "spacy." Ms. Hogg continued counseling plaintiff for her anxiety and panic attacks through October 5, 2004. On October 5, 2004, plaintiff told Ms. Hogg for the first time that she was scared of doing her job because of the dog incident. Plaintiff was scared another dog attack may happen. Ms. Hogg diagnosed plaintiff with panic attacks, anger and worrying about what others think. Ms. Hogg's note states that plaintiff's problems were resolved and further referral for treatment was not needed. Ms. Hogg further noted that plaintiff's current level of functioning should not result in job jeopardy.
14. Plaintiff returned to Dr. Parker on October 7, 2004 and reported that she was doing better and represented that Ms. Hogg had diagnosed her with Post-Traumatic Stress Disorder (hereinafter "PTSD"). However, none of the medical records from Ms. Hogg reflect that she diagnosed plaintiff with PTSD. *Page 7 
15. Plaintiff saw Dr. James Smith, a psychiatrist, on October 27, 2004. She reported symptoms including panic attacks, fearfulness, fright, difficulty concentrating, and inability to cope. It is recorded in the October 27, 2004 note that plaintiff is disabled due to PTSD with panic attacks.
16. However, when questioned during his deposition on how he reached this diagnosis, Dr. Smith admitted that he did not review any of plaintiff's prior medical records when he first saw plaintiff on October 27, 2004 and that plaintiff represented, incorrectly, to him that she had already been diagnosed with PTSD. Further, he did not perform any testing on plaintiff and could not even recall whether plaintiff had been bitten or simply scared by the dog. Dr. Smith stated that he could not achieve a lot in 20 minutes. Dr. Smith testified that plaintiff noted additional unrelated stressors, such as being a single mother, and that these particular stressors were expressed months before any discussion of the dog attack occurred. Significantly, Dr. Smith conceded that he would expect plaintiff to be focused on the dog attack and discussing that with her caregivers if that was the true initiating stressor that led to her PTSD.
17. It is noted, and the medical records reflect, that no doctor or counselor prior to Dr. Smith diagnosed plaintiff with PTSD.
18. After Dr. Smith restricted plaintiff from working as an Animal Control Officer, plaintiff continued working for defendant as a dispatcher until December 1, 2004 at which time defendant could no longer accommodate plaintiff. Plaintiff was placed on leave until February 2005 and given an opportunity to find another position with defendant.
19. Plaintiff had attempted to apply for several positions with defendant between February and November 2004. Even so, several of her applications were not considered because she had not completed them accurately or she did not meet the minimum qualifications. Plaintiff *Page 8 
did not apply for any positions after December 1, 2004. Ms. Ruth Elizabeth Travis, Senior Human Resources Consultant for defendant, testified that there were three positions available with defendant after December 1, 2004 for which plaintiff would have been qualified.
20. On February 2, 2005, Dr. Smith wrote a letter indicating that plaintiff has been unable to work due to her psychiatric condition retroactive to December 1, 2004, which was in fact the date defendant could no longer accommodate plaintiff's work restrictions. Dr. Smith had not written plaintiff out of work previously.
21. Plaintiff was extensively evaluated by Dr. Jerry W. Noble, a clinical psychologist, on July 15, 2005. Dr. Noble spent six to eight hours with plaintiff, including formal testing. Furthermore, he spent approximately 20 hours reviewing plaintiff's records. Dr. Noble diagnosed plaintiff with Panic Disorder resulting from plaintiff's psychosocial stressor of being a single working mother of an infant. He also diagnosed plaintiff with dysthymic disorder, a mood disorder associated with chronic and long-term low-grade depression.
22. Dr. Noble opined that plaintiff's symptoms did not reach the threshold necessary to diagnose her with PTSD. The basis for this opinion being that (1) the type of event plaintiff faced was not serious enough, such as serious injury or death, and that (2) plaintiff did not react to the event in a manner consistent with someone who had PTSD, such as helplessness or near paralysis. Dr. Noble opined that the dog attack was frightening and probably added to the level of anxiety and depression that plaintiff was probably already under but doubted that it created a condition of PTSD. Dr. Noble opined that plaintiff's belief that she has PTSD was influenced in part by discussions with mental health professionals or that plaintiff herself injected the diagnosis or raised the possibility when she treated with Ms. Hogg and Dr. Smith. *Page 9 
23. Dr. Noble expressed his belief that the December 5, 2003 incident did not have a long-term effect. He believes that at the moment the incident occurred, plaintiff somehow connected the attack to her existing anxieties about being a single parent and that there would be consequences for her if she were injured. Dr. Noble indicated that plaintiff was able to work after December 1, 2004 but that she should avoid jobs that present a significant risk of injury due to her anxieties about being a single parent.
24. Having considered the testimony of Drs. Smith and Noble, and the circumstances of their involvement with plaintiff's treatment, the Full Commission gives greater weight to the testimony and expert opinions of Dr. Noble than to those of Dr. Smith and finds that plaintiff did not contract PTSD or any other injury as a result of the incident that occurred on December 5, 2003.
 **********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order for an injury to be compensable under the Workers' Compensation Act, it must be the result of an accident arising out of an in the course of employment. N.C. Gen. Stat. § 97-2(6). Plaintiff has the burden of proving that the injury complained of resulted from an injury by accident arising out of and in the course of the employment.Henry v. A.C. Lawrence Leather Co., 231 N.C. 477, 57 S.E.2d 760 (1950). Plaintiff must show that the incident constituted an interruption of the routine of work and the introduction thereby of unusual conditions likely to result in unexpected consequences. Adams v. BurlingtonIndustries, Inc., 61 N.C. App. 258, 300 S.E.2d 455 (1983). An accident is an unlooked for and untoward event not *Page 10 
expected or designed by the employee. An accident is not established by the mere fact of injury but is to be considered as a separate event preceding and causing the injury. No matter how great the injury, if it is caused by an event that involved both an employee's normal work routine and normal working conditions it will not be considered to have been caused by accident. Searsey v. Perry M. Alexander ConstructionCo., 35 N.C. App. 78, 239 S.E.2d 847. (1978). In the case at bar, approaching and handling aggressive dogs was part of plaintiff's normal work routine and her normal work conditions. Plaintiff's testimony, and more so the written incident report regarding the incident of December 5, 2003, indicates that she was approached by an aggressive dog, something that happened on a routine basis during the course of her employment, and that she handled the aggressive dog in the same manner she had handled aggressive dogs in the past. Dealing with an aggressive dog was not an unlooked for or untoward event as plaintiff always approached dogs with mace ready in anticipation of the dog becoming aggressive. As such, plaintiff has not shown that the incident of December 5, 2003 was an accident. Id.
2. Plaintiff has the burden of proving a causal connection between her injury and her employment. Rutledge v. Tultex Corp., 308 N.C. 85,308 S.E.2d 359 (1983). Plaintiff must prove this element of causation by the greater weight of or a preponderance of the evidence. Phillips v. U.S.Air, Inc., 120 N.C. App. 538, 463 S.E.2d 259 (1995), affirmed,343 N.C. 302, 469 S.E.2d 552 (1996). Although the employment-related accident need not be the sole causative force to render an injury compensable, the plaintiff must prove that the accident was a causal factor by a preponderance of the evidence. Ballenger through Husfelt v.ITT Grinnell Indus. Piping, Inc., 320 N.C. 155, 357 S.E.2d 683
(1987). Assuming arguendo, that the incident on December 5, 2003, was an accident as defined under North Carolina Workers' Compensation *Page 11 
Law, plaintiff has not shown by the greater weight of the competent evidence that she suffers from PTSD or any other injury as a result of the incident that occurred on December 12, 2003.
 **********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits is hereby DENIED.
2. Each side shall bear its own costs.
This the 5th day of June, 2007.
 S/______________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/______________________ BUCK LATTIMORE CHAIRMAN
DISSENTING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 12